## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Antoine Omar Watson, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | **1:21cv880 (RDA/TCB)** |
| | ) | |
| Harold W. Clarke, | ) | |
|     Respondent. | ) | |

### MEMORANDUM OPINION

Antoine Omar Watson ("Petitioner" or "Watson"), a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his 2007 convictions for rape, robbery, forcible sodomy, armed statutory burglary, and two counts of use of a firearm in the commission of a felony in the Circuit Court of the City of Norfolk, Virginia. The Respondent filed a Rule 5 Answer and a Motion to Dismiss, with supporting briefs and exhibits. [Dkt. Nos. 13-18]. Petitioner was advised of his right to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K) to the motion to dismiss [Dkt. No. 9], and he filed a response. [Dkt. No. 20]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the respondent's Motion to Dismiss must be granted and the petition will be dismissed with prejudice.

### I. Procedural History

Watson is in custody pursuant to an order dated February 8, 2007 entered by the Circuit Court for the City of Norfolk, Virginia, which imposed a total sentence of 108 years in prison with 63 years suspended for six felony convictions: rape, robbery, forcible sodomy, armed statutory burglary, and two counts of use of a firearm in the commission of a felony. Watson was originally

charged with thirteen felonies, each of which occurred on or about August 6, 2005: abduction with intent to defile, in violation of Virginia Code § 18.2-48; rape, in violation of Virginia Code § 18.2-61; robbery, in violation of Virginia Code § 18.2-58; forcible sodomy, in violation of Virginia Code § 18.2-67.1; animate object sexual penetration, in violation of Virginia Code § 18.2-67.2; armed statutory burglary, in violation of Virginia Code § 18.2-90; six counts of use of a firearm in the commission of a felony, in violation of Virginia Code § 18.2-53.1; and one count of wearing a mask in public, in violation of Virginia Code § 18.2-422.[1] On May 23, 2006, by agreement with the prosecution, a *nolle prossequi* was entered on the following felony charges: abduction, animate object sexual penetration, four counts of use of a firearm in the commission of a felony, and wearing a mask in public. Watson pleaded guilty to the remaining charges.

After Watson tendered his guilty pleas, he confirmed that he had read and signed the plea agreement, that he had discussed the agreement with his attorney, and that he understood the agreement. (5/23/06 Tr. at 4-5). Watson stated that he understood that "on the matters that" he was "pleading guilty to," he had "no definite agreement with the Commonwealth" with regard to the sentence that would be imposed (Id. at 5); that the plea agreement stated that the matter would be referred for a presentence report and that Watson would be sentenced by the court following argument by counsel; and that had he signed an "Advice to Defendants Pleading Guilty" form ("Advice Form") acknowledging that he could be sentenced to four life terms plus eight years in prison. (CCT H. at 327). The Advice Form Watson signed included the statement that he was pleading guilty because he was "in fact guilty." (5/23/06 Tr. at 5; CCT H. at 326). The circuit court accepted his guilty pleas and found they were "voluntarily and intelligently entered." (5/23/06 Tr. at at 7).

---

[1] <u>Commonwealth v. Watson</u>, Case Nos. CR06000047-00 through -12.

The prosecutor proffered the expected evidence to the Court stating the:

evidence would have been that on August the 6th of 2005, the victim in the case, [J.C.], was living at [address redacted] here in Norfolk. She lived in Apartment 101. She would indicate, Your Honor, that she was inside her residence in the early morning hours on that date between three and five o'clock in the morning asleep on the living room couch.

She went to change her position while she was on the living room couch, at which time she opened her eyes and looked up and saw a tall figure standing next to her and above her.

The person appeared to also have a firearm in his possession pointed at her. She would indicate that the firearm was actually put to her temple, and she could feel the barrel of the gun against her skin.

At that point, or after that point, Your Honor, she was directed to remove some of her clothing and pull down her pajama pants and her underwear, at which time the suspect got on top of her and raped her.

[J.C.] would also indicate, Your Honor, that while this was going on or after that, that she noticed also that there were other individuals unknown to her inside the residence, other males inside of the premises.

She would indicate, Your Honor, that during the time that they were in there, that the various males took turns sodomizing her, at different points putting their penis inside of her mouth against her will. She would indicate that the gun was out and displayed while this was going on and that she was afraid. She tried to tell them that her roommate or boyfriend was getting ready to come home in order to try to get them to leave thinking they might be scared if they were interrupted, but it didn't work, and they remained on the premises and sexually assaulted her.

Her testimony, Your Honor, would also be that while she was inside of the apartment, that there came a point at which she was told to turn over and face the back of the couch. She did so. And once she did that, that one of the individuals then reached inside of her shirt and touched her breasts, and then also one of them inserted his finger inside of her vagina.

Before leaving the residence, some of her property was also picked up and then taken including a denim jean purse that contained personal items belonging to her, identifying documents including her military ID card, her checkbook, other things that had her name on it and indicated that it was her property. Also her car keys and a cell phone that belonged to her were also taken.

Once they left, Your Honor, she then notified her roommate who was inside the residence but never heard anything. And also the police were notified and responded to the scene.

During the investigation, Your Honor, Investigator Dale Stacey developed suspects in the case, and one of them became an Ervin Sanderson. He's also been charged in this matter and has pled guilty to various charges related to the incident.

3

He would have testified on behalf of the Commonwealth, Your Honor, that the defendant was, in fact, the individual who had the gun that the victim described as being held by the taller, the tallest of the individuals who were in there.

Mr. Sanderson would corroborate that the defendant was the tallest of all the individuals that entered the residence and committed these acts to [J.C.]. He would also indicate, Your Honor, that the defendant, in fact, was on top of her and raped her and that he saw that and that the individuals, they all then sodomized [J.C.] as well.

He would indicate to the Court that he participated in that as well and put his penis inside of her mouth as well as the crime partners, I'll call them, while this was going on. He also would corroborate the fact that a denim purse was taken from the residence as [J.C.] would indicate that it was taken from the residence during the incident.

Judge, the Commonwealth would also anticipate calling witnesses who would indicate that they knew the defendant and had contact with him very shortly after the rape had occurred and after [the defendant] had left the residence. [The defendant] went over to a friend's house and was in possession of a denim purse at that time.

Once he arrived at the location, Your Honor, he indicated that he had just left a lady's house and he had sex with her, and that's where he got the purse.

The witnesses would indicate that the defendant dumped the contents of the purse out, and it had identification in there belonging to the lady. The witness would describe the identification as belonging to a white female. And she, in fact, told the police when she spoke to them the same day of the incident that the name on the ID she saw was [J.C.]. That's our victim's name.

In addition to that, Your Honor, our witness would indicate that while the defendant was there, he also pulled out a cell phone that he said he had gotten and called a friend of theirs from the victim's cell phone so that the victim's number would appear in the friend's cell phone in the event the friend wanted to call the defendant on the victim's phone.

The Commonwealth would have called Investigator Stacey to testify that in his investigation he submitted a request to Verizon cellular in order to request the cell phone records of the victim based on the number she provided as being her assigned number on her Verizon phone. Verizon provided documents of her phone records during the relevant time period of the date of this offense and the hours shortly after the rape occurred and the cell phone was taken.

The Commonwealth would have called the manager of the Verizon store located on Military Highway here in Norfolk, the custodian of the records for this case, who would have confirmed the victim's cell phone records that were provided as being Verizon cell phone records, Your Honor. And looking at the records, they would have confirmed that a call was made from the victim's cell phone to another number right after the robbery, that our other witness who saw the defendant make

4

that call to the friend's cell phone would have identified as their friend's cell phone number.

In addition to that, Your Honor, during the course of the investigation, another acquaintance, a friend of the defendant, turned over that jean purse to Investigator Dale Stacey along with an identification, the defendant's identification card, from the same location in which she found it. That was turned over to the police, again, the same day of the rape and the home invasion robbery involving [J.C.].

We also would have presented, Your Honor, evidence that the defendant, after he became a suspect, was, of course, wanted by the police and efforts were made to try to locate him and apprehend him.

The Commonwealth would have called a couple of investigators here in Norfolk who were out looking for him in the Ocean View area on August 13th of last year. They would testify that they came in contact with the defendant. He matched a picture on a wanted poster that had been provided by Investigator Stacey during his investigation. When he got out of his marked unit to go and approach the defendant, he fled, took off running. He managed to get away from them.

Our evidence would also have been, Your Honor, that the defendant is known to his friends, the codefendant, and our other witnesses by the name of Cash.

While he was running from the police, others in the area were chanting, Go, Cash, go, and he managed to get away from the police. Three days later on August the 16th of last year, Virginia Beach police officers, Your Honor, also came in contact with the defendant in their city.

The Commonwealth would have called the Department of Virginia Beach officers who would have testified as to their attempted interaction with the defendant, and he fled from them as well hiding under a vehicle at one point, going over a fence.

K-9 officers got their dogs involved and tried to apprehend him. He was ultimately apprehended when they found him next to a shed in someone's backyard area, and he was taken into custody at that point. They got his information, ran him, and found he had outstanding warrants on our charges here in the city of Norfolk. So he was taken into custody at that point, Your Honor.

And all these events, except for what happened in Virginia Beach, occurred here in the city of Norfolk.

(Id. at 7-15). In response to a question from the court, the prosecutor added that entry of the

victim's residence was made:

[t]hrough the victim's sliding glass door." There is a patio area through the rear of the apartment, and our codefendant would indicate, Your Honor, that the defendant kind of fiddled with the door area. It was not locked. It was unlocked but it was closed and that he opened the door and then proceeded to go in.

(Id. at 15). The Commonwealth added, in answer to the court's question, that the victim was from Tennessee. (Id.).

Watson stipulated that the proffer was "the evidence" "from the Commonwealth's perspective" that would have been presented had the matter gone to trial. (Id.). The trial court found that the stipulated evidence "certainly justifies Mr. Watson's pleas" and found Watson "guilty of the matters to which he's pled guilty."

Several months later, Watson filed a motion to withdraw his guilty pleas, which the circuit court heard on January 11, 2007. At the hearing, Watson again confirmed, under oath, that the statements in his plea agreement were true. The prosecutor first questioned Watson about the contents of the "Advice to Defendants Pleading Guilty" form:

> Q. And do you remember going over a form with Ms. Garris, who was your attorney at the time, talking about the fact that you were pleading guilty? Do you remember that?
>
> A. Yeah.
>
> Q. The form that indicated what charges you were going to be pleading guilty to?
>
> A. Yes.
>
> Q. And in that same form it talked about the fact that you were pleading guilty because you were, in fact, guilty. Do you remember that?
>
> A. Yes.
>
> Q. And on that same form you indicated that you understood all the rights that you were giving up by pleading guilty, correct?
>
> A. Yes.
>
> Q. And not only did you sign that form or initial that form, but Judge Morrison went over those same items with you before accepting your guilty plea; is that right?
>
> A. Yes.
>
> Q. And in that form there is a sentence that reads that, My lawyer and I have talked about whether to plead guilty or not guilty and I decided for myself that I should plead guilty. Do you remember that?
>
> A. Yes.

Q. And you also indicate in there that nobody connected with the prosecution of the case or your arrest or any other person has threatened you or forced you into entering your plea of guilty, correct?

A. Yeah.

Q. And you indicated that you understood, you acknowledged you had enough time to talk about any possible defenses that you might have had with your attorney, Ms. Garris; is that correct?

A. Yes, ma'am.

Q. You also indicated in that same document that you were satisfied with the services of your attorney at that time, correct?

A. Yes, ma'am.

Q. You also indicated that you read all the items contained in that document and that all the answers were truthful. Is that not true?

A. Yes.

Q. Is that true, Mr. Watson? You indicated that you had read each of the items in the document and that your answers were truthful?

A. Yeah. I ain't read it, but she read it to me.

Q. Well, she read it to you and you indicated that the answers were truthful, correct, because that's what you told the judge when he asked you; is that right?

A. Yes, ma'am.

(1/11/2007 Tr. at 19-21).

At the hearing on his motion to withdraw his guilty pleas, Watson testified that his counsel had given him "bad advice" when she recommended that he plead guilty because there was no DNA or fingerprint evidence that he was guilty, and he thought that there should be such evidence if he was guilty. (Id. at 13-14). Watson admitted at the time he pleaded guilty that he was aware that there was "[n]o DNA evidence linking [him] to the victim," and that the victim had testified at the preliminary hearing that "none of the assailants [had] used a condom." (Id.). Watson admitted at the time he pleaded guilty that he was also aware that there were no fingerprints of his that linked him to the crime scene. (Id. at 14). Watson admitted that his counsel had not misled him about the lack of such evidence, and that no one had misled him about the Commonwealth's evidence. (Id. at 17, 23). Watson also questioned the absence of the victim's medical records at

7

the preliminary hearing. Watson further admitted that his brother had spoken with him and told Watson that the odds were against him and to do what was best for him. (Id. at 18).

Watson insisted that his attorney "coerced" him into pleading guilty, but was vague in explaining what his attorney did that constituted coercion. He stated that his attorney had not represented him in "good faith" and that he felt like he had "no other option" other than to plead guilty. (Id. at 23-24). Watson eventually stated that his attorney had told him pleading guilty was his "best option" and that she did not "see why [Watson] should go out there and go to trial and risk ... getting six life sentences plus 28 years when [he could] just take the plea and get eight years." (Id. at 24). Counsel explained that the "eight years" would be the starting point under the plea agreement (because the 20 years of mandatory time for four of the firearm offenses would be terminated by a *nolle prosequi*), and that the court would decide what sentences were imposed for the other offenses. (Id. at 33, 34). The trial court denied Watson's motion to withdraw his guilty pleas, and then proceeded to sentencing.

The trial court sentenced Watson to: thirty years in prison, with twenty years suspended, on his conviction for rape; twenty years in prison, all suspended, on his conviction for robbery; twenty years in prison, all suspended, on his conviction for forcible sodomy; thirty years in prison, with three years suspended, on his conviction for armed statutory burglary; and three years on his first conviction for use of a firearm in the commission of a felony and five years on his second conviction for use of a firearm in the commission of a felony. The net active sentence imposed was forty-five years.

The Court of Appeals of Virginia denied Watson's petition for appeal on August 17, 2007. Watson v. Commonwealth, Record No. 0362-07-1. The Supreme Court of Virginia refused his subsequent petition for appeal on July 15, 2008. Watson v. Commonwealth, 072602.

8

On or about May 11, 2017, Watson sent an "independent action," citing Virginia Code §

8.01-428, to the circuit court, which was filed on May 17, 2017 and raised two claims:

> 1. Watson's plea and sentence are void in that the Court committed an ultra vires
> act when it accepted Watson's plea and found him guilty without fully complying
> with Rule 3A:8 and Virginia Code § 19.2-254; and
>
> 2. The Commonwealth committed fraud by way of concealment of material fact(s)
> and prevented a fair submission of the controversy before the Court when it
> concealed a plea agreement between the Commonwealth and Ervin Sanderson
> which clearly demonstrates that Sanderson received favorable treatment in
> exchange for his testimony.

Watson v. Commonwealth, Case No. CL17005736-00 ("MTV"). The circuit court dismissed the

civil action on August 4, 2017, holding that it lacked jurisdiction to consider the matter because it

was untimely under Va. Sup. Ct. R. Rule 1:1, and because Watson had not established that he was

entitled to relief under Code § 8.01-428(D). (MTV at 69-70). The Supreme Court of Virginia

refused his petition on June 11, 2018. Watson v. Commonwealth, Record No. 171314.

On October 1, 2018, Watson filed a "Motion for Scientific Analysis of Previously Untested

Evidence," citing Code § 19.2.-327.1 in the circuit court. Watson requested that a "yellow t-shirt

with logo" collected in his case be tested for the presence of DNA. Watson v. Commonwealth,

CR18-2174-00 (CCT 2 at 81, 82, 86-87). Watson executed the Motion on September 25, 2018.

(Id. at 91). The motion alleged that "Five days after the alleged incident occurred on August 11,

the City of Norfolk's Department of Police Property Clerk invoiced a 'yellow t-shirt with logo'

which was turned over to investigators by Nekesha King. Detective D. E. Stacey signed the invoice

sheet, with Detective D. B. O'Connor as a witness verifying Detective Stacey's signature. The

'yellow t-shirt with logo' was never submitted for DNA testing." (Id. at 85-86). The circuit court

appointed counsel to assist Watson with the motion. (Id. at 84).

In its response to the motion, the prosecutor contacted the clerk of the circuit court, the

Virginia Department of Forensic Science, and the Norfolk Police Department, and determined by

their responses that either each had never had any physical or biological evidence related to the case in their possession, or that any such evidence had been destroyed. (Id. at 60). The Norfolk Police Department confirmed that it had received a "yellow t-shirt with logo" turned over to them by Nekesha King, which had been destroyed on February 22, 2012. (Id. at 72, 75).

The circuit court heard Watson's motion on January 25, 2019, and denied relief by an order dated January 29, 2019, which stated:

> Upon motion of the defendant for the scientific investigation of human biological evidence pursuant to the provisions of subsections A and B of Virginia Code 19.2-327.1 and following a hearing held pursuant to the provisions of subsection D of Virginia code 19.2-327.1, the Court finds: (1): that there is no physical or biological evidence in existence that could be stored pursuant to Section 19.2-270.4:1 and (2) there is no physical or biological evidence in existence that could thereafter be tested pursuant to Section 19.2-327. Accordingly, the Court denies the defendant's motion for Preservation of Human Biological Evidence for failure to state a claim upon which relief can be granted.

(CCT 2 at 54).

Watson, proceeding pro se, filed a state petition for a writ of habeas corpus (dated January 21, 2020) in the circuit court on January 27, 2020, alleging three claims:

> a) "Ineffective Assistance of Counsel: counsel failed to secure or otherwise preserve evidence establishing actual innocence. This was in an effort to hide evidence of coercion to influence guilty pleas and protect against claims of ineffective assistance. Counsels made decisions to advocate for other counsels than for me."
> b) "Due Process Violation: evidence establishing innocence was destroyed in violation of procedure and law that prejudiced my ability to have it tested to support my actual innocence as was argued recently following a motion and hearing on testing."
> c) "Insufficient Evidence: absent the availability to test evidence that supports my actual innocence, coupled with the evidence presented supporting ineffective assistance of counsel claims, the remaining evidence and argument is insufficient to support the convictions."

By order dated July 17, 2020, the circuit court dismissed the petition, holding that it was time barred under Virginia law. (CCT H at 262-64, 273) (citing Va. Code § 8.01-654(A)(2)). The court

also held, in the alternative, that claim (a) failed to demonstrate ineffective assistance of counsel

under the criteria set forth in Strickland v. Washington, 466 U.S. 668 (1984); that claim (b) was

without merit because it found that Watson did not allege that the destruction of the t-shirt was in

bad faith; that Watson failed to establish that the results of testing the t-shirt could have been

exculpatory; and that Watson had been able to test the t-shirt prior to trial. It held that Watson's

claim (c) was barred by Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974) because Watson could

have raised this nonjurisdictional issue at trial or on appeal, but failed to do so. It also held that

claim (c) was without merit because Watson had failed to establish that he had been prejudiced by

the failure to test the yellow t-shirt. (CCT H at 264-73). The Supreme Court of Virginia refused

Watson's petition for appeal from that judgment on April 14, 2021. Watson v. Clarke, Record No.

201342.

Watson's § 2254 petition was placed in the institutional mail system on July 14, 2021, and

raises a single claim:

> GROUND ONE: The state proceedings, involving applicable procedures which I
> utilized pursuant to court rules, denied me due process to adequately present my
> issues of constitutional violations challenging the underlying criminal convictions.

[Dkt. No. 1 at 4]. In his "Arguments in Support of Grounds Presented in Petition Under 28 USC

2254 For Writ of Habeas Corpus by a Person in State Custody," Watson alleges the following:

> On October 1, 2018, [Watson] filed ... a Motion For Scientific Analysis of
> Previously Untested Evidence citing Va. Code 19.2-327.1 and requested that a
> "yellow t-shirt with logo" collected in my case be tested for the presence of DNA,
> which [he] argued was invoiced 5 days after the alleged incident and turned over to
> the investigators.

> In response to [the] motion for testing, the Commonwealth acknowledged that a
> yellow t-shirt with logo was collected but admitted that the item was destroyed on
> February 22, 2012. The circuit court held a hearing [the] motion on January 25,
> 2019 and although [it] found that the destruction of the evidence was improper and
> in violation of statute, [it] denied relief to my motion because no relief was available
> "in this type of proceeding" following the destruction of evidence requesting be
> tested.

11

The circuit court then stated [that] relief was possible on the issue of the destruction in the habeas corpus proceeding which [Watson] timely filed arguing Ineffective Assistance of Counsel, Due Process Violation an Insufficient Evidence, all centered on the improper destruction of evidence that would have been used to establish my actual innocence. The circuit court however, without conducting an evidentiary hearing, dismissed my petition on July 17, 2020. [Watson's] subsequent appeal of that dismissal was refused.

The exhaustion requirement is merely an accommodation of the federal system designed to give states an initial opportunity to pass on and correct alleged violations of its prisoner's federal rights. Moreover, the doctrine of exhaustion does not require state prisoners to file repetitious applications in state courts and the mere possibility of success in additional state proceedings does not bar federal relief. 28 USC 2254; see also, Fay v. Noya, 372 U.S. 391 (1963). Despite this opinion, [Watson] nevertheless attempted all available opportunities to raise my issue of due process violations to the state courts utilizing the avenues required under the statutes governing the issue and the type of proceeding.

Virginia law provides a safety net for defendants whose constitutional rights have been violated. Va. Code 8.01-654 is a statute that provides an avenue for redress of federal constitutional violations in state court. A writ of habeas corpus shall be granted to an incarcerated individual who shows "by affidavits or other evidence probable cause to believe he is detained without lawful authority." Va. Code 8.01-654(A)(1).

Therefore, [Watson] felt that following the disclosure of action by the Commonwealth, my best opportunity to obtain fair and substantial justice was through that particular avenue of relief.

In order to succeed in a habeas corpus petition, I was required to show that an adjudication of a claim resulted in the violation of a constitutional right. Walker v. Mitchell, 224 Va. 568 (1983); Gardner v. Warden, 222 Va. 491 (1981). [Watson] argued that denying relief to my motion for testing simply because the Commonwealth destroyed the evidence [Watson] was requesting be tested violated a constitutional right. The constitution, as the framework from which all law springs, must not be violated as applied to my particular case and facts.

Second, in order to raise an issue in a habeas petition, the issue must be one that was not presentable in a direct appeal. Smith v. Murray, 477 U.S. 527 (1986); Coppola v. Warden, 222 Va. 369 (1981); Va. Code 8.01-654(B)(2). [Watson] argued that as the issues rested upon allegations not evident from the record, because [he] was not made aware of the discovery and violation until a hearing on my motion for testing, the claims could not have been raised on direct appeal and [were] therefore properly presented in the state habeas petition.

Because it was firmly established that this type of issue, this particular argument that my right to due process was violated, could have been attacked and adjudicated in the type of proceeding in which [Watson] presented it in, the failure of the state courts to properly adjudicate the issue, or at least hold a hearing on the matter, denied me the simple act of due process of which [Watson is] entitled to. More

importantly, the reasons given in the habeas denial, by the same judge who presided over the motion for testing hearing and suggested that this issue should be presented in a habeas proceeding, established the need for a hearing on the matter to properly determine its importance. As can be found through a review of all the state proceedings, the record was void of the necessary information required to make an "informed" decision and the only way to properly adjudicate the claim was to hold a hearing on the matter. See Williams v. Taylor, 529 U.S. 420 (2000).

[Dkt. No. 2 at 2-4].[2]

## II. Statute of Limitations

A petition for a writ of habeas corpus must be dismissed if filed later than one year after (1) the judgment becomes final; (2) any state-created impediment to filing a petition is removed; (3) the United States Supreme Court recognizes the constitutional right asserted; or (4) the factual predicate of the claim could have been discovered with due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D). In calculating the one-year period, however, the Court must exclude the time during which properly filed state collateral proceedings pursued by a petitioner were pending. See 28 U.S.C. § 2244(d)(2); Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005) (determining that the definition of "properly filed" state collateral proceedings, as required by § 2244(d)(2), is based on the applicable state law as interpreted by state courts). Watson's state court direct appeal proceedings were final on July 15, 2008, the date the Supreme Court of Virginia refused his petition for appeal. The federal statute of limitations period began to run 90 days later on Tuesday, October 14, 2008, the date upon which his time for seeking a petition for a writ of certiorari to the Supreme Court of the United States had expired. See Harris v. Hutchinson, 209 F.3d 325, 328 n.1 (4th Cir. 2000) (explaining that the AEDPA provides that the one-year period does not commence until the latest

---

[2] At least two of Watson's assertions are incorrect. First, the circuit court did not find that the destruction of the evidence was improper in violation of a statute. The statute discussed at the hearing was Virginia Code § 19.2-270.4, which states, in pertinent part, that "the trial court in any criminal case may order the donation or destruction of any or all exhibits *received in evidence during the course of the trial*." (emphasis added). As the prosecutor pointed out at trial, Watson pleaded guilty, and the record establishes that there were no items of physical evidence (either the yellow t-shirt or any certificate of analysis) received into evidence. (1/25/19 Tr. at 21). Next, the circuit court never stated that habeas was a "possible" remedy; the prosecutor mentioned habeas in response to a question by the court. (Id. at 21).

of the date when judgment on direct review "became final" or "the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A)). Watson therefore had until October 14, 2009 to file his federal habeas petition. Watson, however, did not file his federal petition until July 14, 2021, which was more than eleven years after his direct appeal was final. Watson's § 2254 petition is untimely unless the limitations period is tolled. The record establishes that Watson is not entitled to statutory or equitable tolling.

*A. Statutory Tolling*

Watson's motion to vacate and habeas petitions were not timely filed, and he is therefore not entitled to statutory tolling during the pendency of those petitions. See 28 U.S.C. § 2244(d)(2). The circuit court determined the motion to vacate was untimely and dismissed that motion on August 4, 2017 (MTV at 69-70), and the Supreme Court of Virginia refused his petition for appeal on June 11, 2018. Approximately eighteen months later, in January 2020, Watson filed a state petition for a writ of habeas corpus in the circuit, which determined that Watson's state habeas petition was untimely under Virginia Code § 8.01-654(A)(2), and dismissed the petition on July 17, 2020, holding that it was time barred under Virginia law. (CCT H at 262-64, 273). The Supreme Court of Virginia refused the petition for appeal on April 14, 2021. Accordingly, since both of Watson's state postconviction proceedings were timely filed, neither of the state postconviction proceedings tolled the federal statute of limitations. See Pace, 544 U.S. at 417 (holding that petitioner was not entitled to statutory tolling under 28 U.S.C. § 2244(d)(2) where state habeas petition was dismissed as untimely); Artuz v. Bennett, 531 U.S. 4, 8 (2000) (holding that a state collateral proceeding is not "properly filed" for purposes of tolling the federal limitations period if it is filed untimely).

To the extent that Watson argues he did not have knowledge of the yellow t-shirt at the time of his pleas, he knew of its existence before October 1, 2018, the date of his motion for DNA

14

testing in the circuit, because that motion specifically mentions the yellow t-shirt. Motion, Code § 19.2.-327.1 at 81, 82, 86-87.[3] Those proceedings concluded on January 29, 2019. (CCT 2 at 54). Watson did not file his federal habeas petition until July 14, 2021 — more than two years after the latest he learned of the yellow t-shirt.

### B. Equitable Tolling

The United States Supreme Court has held that a habeas petitioner may be permitted to file a federal habeas petition out of time if he can establish his entitlement to equitable tolling, which requires that the petitioner show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. See Holland v. Florida, 560 U.S. 631, 649 (2010) (citation omitted). The Fourth Circuit has explained that equitable tolling is reserved for "those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Harris, 209 F.3d at 330.

In his federal habeas petition, Watson argues that he had to file a state habeas petition in order to exhaust his claim before filing in federal court. As already discussed herein, the untimely state proceedings did not toll the federal statute of limitations, which had expired well prior to his filing the state habeas petition. Further, nothing prevented petitioner from simultaneously filing a federal petition at the same time he filed his state petition to preserve his right to federal review. The Supreme Court has expressly sanctioned filing a federal petition and at the same time seeking a stay from the district court to allow for exhaustion in state court where the state petition could result in a dismissal as untimely, which would negate tolling while the state proceedings were pending. The Supreme Court held "[a] prisoner seeking state postconviction relief might avoid this

---

[3] The motion to proceed in forma pauperis that accompanied the motion was dated September 25, 2018. (CCT 2 at 91).

predicament ... by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." <u>Pace</u>, 544 U.S. at 416 (citing <u>Rhines v. Weber</u>, 544 U.S. 269, 278 (2005)); <u>see, e.g.</u>, <u>Freeman v. Page</u>, 208 F.3d 572, 577 (7th Cir. 2000) ("a prisoner who wants to pursue state relief while assuring an entitlement to federal relief can protect himself by filing in both courts. The federal action should be stayed while the state court decides what to do.").[4]

Watson also seeks to apply the rule in <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012), allowing review of certain ineffective assistance of counsel claims. <u>Martinez</u> may excuse certain state defaults in limited circumstances, but it does not excuse otherwise untimely federal habeas petitions or provide tolling under the AEDPA. <u>Id</u>; <u>see</u> <u>Arthur v. Thomas</u>, 739 F.3d 611, 631 (11th Cir. 2014) (holding that the narrow <u>Martinez</u> exception does not save an untimely habeas petition because the exception is meant to be difficult to meet "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."). In the context of a § 2255 petition, the district court in <u>United States v. Rice</u>, No. 03cr441 (RBW), 2019 U.S. Dist. LEXIS 68898 (D.D.C. Apr. 22, 2019), held that that the procedural default exception recognized in <u>Martinez</u> and <u>Trevino v. Thaler</u>, 569 U.S. 413, 423 (2013) does not apply in the context of the AEDPA's statute of limitations bar. <u>Id.</u> at *12-13 (discussing cases from Third, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits).

---

[4] If Watson were to claim lack of knowledge of the law, the Fourth Circuit has already held that this is not the type of extraordinary circumstance that would justify equitable tolling. <u>See</u> <u>United States v. Sosa</u>, 364 F.3d 507, 512 (4th Cir. 2004) (holding that <u>pro se</u> petitioner's ignorance and misconceptions about the operation of the statute of limitations do not justify equitable tolling because they are not extraordinary circumstances beyond his control); <u>Rouse v. Lee</u>, 339 F.3d 238, 248-49 (4th Cir. 2003) (holding that a party's incorrect interpretation of the AEDPA statute of limitations did not present extraordinary circumstances to warrant equitable tolling); <u>Felder v. Johnson</u>, 204 F.3d 168, 171-73 (5th Cir. 2000) (holding that lack of notice of AEDPA amendments and ignorance of the law are not rare and exceptional circumstances that warrant equitable tolling).

## C. *Actual Innocence*

Actual innocence may also allow review of an untimely habeas petition. McQuiggin v. Perkins, 569 U.S. 383, 392 (2013). To qualify, a petitioner must demonstrate that "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649. "[T]he second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary and beyond its control." Menominee Indian Tribe v. United States, 136 S. Ct. 750, 756 (2016); see Carpenter v. Douma, 840 F.3d 867, 872 (7th Cir. 2016) (noting Supreme Court had recently reiterated that the extraordinary circumstances element is met "only where the circumstances that caused a litigant's delay are both extraordinary and beyond [his] control.") (quoting Menominee Indian, 136 S. Ct. at 756) (emphasis added).

"[C]laims of actual innocence are rarely successful," Schlup v. Delo, 513 U.S. 298, 324 (1995), however, and "should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998). The standard of review for demonstrating innocence under Schlup is a demanding one. It requires that "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" McQuiggin, 569 U.S. at 401 (quoting Schlup, 513 U.S. at 316).

In order to demonstrate the fundamental miscarriage of justice exception to AEDPA's statute of limitations, a petitioner must present new evidence to support his claim of actual innocence, and "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the *new* evidence." Schlup, 513 U.S. at 327 (emphasis added). Watson has not proffered any "new reliable evidence" demonstrating a colorable claim of actual innocence.

17

Coleman v. Thompson, 501 U.S. 722, 730 (1991); Sharpe v. Bell, 539 F.3d 372, 377 (4th Cir. 2010). Instead, he argues only the "possibility" that evidence available at the time may have been of benefit it had been tested. Here, during the hearing on the motion for testing in the state circuit court, the court found that Watson's trial counsel was provided with the voucher that listed the yellow t-shirt in the discovery material provided by the prosecutor. (CCT 2 at 40).[5] The yellow t-shirt is not new, and was, at best only "potentially useful," and therefore not material. Cf. Long v. Hooks, 972 F.3d 442, 504 (4th Cir. 2020) (observing that untested biological evidence that was no longer available for testing "was only 'potentially useful' and, at least without bad faith, not material.") (citing Arizona v. Youngblood, 488 U.S. 51, 58 (1988)); see, infra at 23. Indeed, in a similar scenario of post-trial destruction of evidence, the Fourth Circuit upheld as reasonable a state habeas court's dismissal of a "failure to preserve potentially useful evidence" claim because it did "not constitute a denial of due process unless a defendant can show bad faith on the part of the state." Lovitt v. True, 403 F.3d 171, 187 (4th Cir. 2005).[6]

### III. Exhaustion and Procedural Default

Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court. See 28 U.S.C. § 2254(b); Granberry v. Greer, 481 U.S. 129 (1987). To comply with the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's

---

[5] Wright v. Commonwealth, 52 Va. App. 690, 697, 667 S.E.2d 787 (2008) (en banc) ("The 'unilateral avowal of counsel, if unchallenged' is a proper proffer.... [that] the trial court was entitled to consider the proffer as true") (quoting Whittaker v. Commonwealth, 217 Va. 966, 969, 234 S.E.2d 79, 81 (1977)).

[6] There is no evidence that the assailant wore a yellow t-shirt. During state habeas proceedings, the respondent introduced exhibits that indicated Watson was known by the nickname "Cash." (CCT H at 224). Within a few hour after the rape, Watson admitted to Nekesha King that he had sex with the victim, but he told her it was consensual. At that time, King told the detective who took her statement that Watson was dressed in "black pants with black shirt." (Id. at 213). Ervin Sanderson, a co-defendant, told the detective who took his statement that during the incident that led to the charges, Watson had been dressed in "all black." (Id. at 220).

established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, a

petitioner convicted in Virginia must have presented to the Supreme Court of Virginia the same

factual and legal claims raised in his § 2254 petition. See, e.g., Duncan v. Henry, 513 U.S. 364,

365-66 (1995); Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002).

Even if Watson had timely filed his federal petition, his claims are defaulted. "A habeas

petitioner is barred from seeking federal review of a claim that was presented to a state court and

'clearly and expressly' denied on the independent, adequate state ground of procedural default."

Bennett v. Angelone, 92 F.3d 1336, 1343 (4th Cir. 1996) (citing Harris v. Reed, 489 U.S. 255, 263

(1989)). A procedural rule is adequate "if it is regularly or consistently applied by the state court,"

and independent "if it does not 'depend[] on a federal constitutional ruling.'" Yeatts v. Angelone,

166 F.3d 255, 260 (4th Cir. 1999) (quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)). Further,

"[a] claim that has not been presented to the highest state court nevertheless may be treated as

exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner

attempted to present it to the state court." Baker, 220 F.3d at 288 (citing Gray v. Netherland, 518

U.S. 152, 161 (1996)). Such claims are simultaneously exhausted and defaulted. See Burket v.

Angelone, 208 F.3d 172, 183 n.11 (4th Cir. 1999).

Virginia Code § 8.01-654(A)(2) is an adequate and independent bar that precludes federal

review of a claim.  See Sparrow v. Dir., Dep't of Corr., 439 F. Supp. 2d 584, 588 (E.D. Va. 2006)

; see, e.g., Baker v. Clarke, 95 F. Supp. 3d 913, 917-18 (E.D. Va. 2015) ("many courts have held,

Virginia Code § 8.01-654(A)(2) constitutes an adequate and independent state-law procedural rule,

as it is a statutory rule that is not tied to the federal Constitution.") (citation omitted).

A procedurally defaulted claim may be reviewed if a petitioner can show cause for the

default and prejudice stemming therefrom, or that a fundamental miscarriage of justice otherwise

will occur. Harris, 489 U.S. at 260. The existence of cause ordinarily turns upon a showing of (1)

a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. Clozza v. Murray, 913 F.2d 1092, 1104 (4th Cir. 1990). Importantly, a court need not consider the issue of prejudice in the absence of cause. See Kornahrens v. Evatt, 66 F.3d 1350, 1359 (4th Cir. 1995).

The Court has already addressed the issue of cause in the context of the untimeliness of Watson's § 2254 petition. In addition, there is nothing novel about his claim, no factor external to him prevented him from having the item tested at trial or to his pursuit of the claim after October 18, 2018 (when the prosecutor notified him that the yellow t-shirt had been destroyed), and his ineffective assistance of counsel claim in state habeas was found to be without merit — a claim which he has not pursued in federal habeas.

### IV. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, 556 U.S. 111, 121 (2009). "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 20 (2013).

An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Renico v. Lett, 559 U.S. 766, 772-73 (2010). That is, the state court's judgment "must be objectively unreasonable, not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (internal quotations

and citation omitted); see Harrington v. Richter, 562 U.S. 86, 103 (2011) (state decision is unreasonable application of federal law only if ruling so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair[-]minded disagreement").

This "highly deferential standard ... demands that state court decisions be given the benefit of the doubt." Renico, 559 U.S. at 773 (internal quotations and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." Lenz v. Washington, 444 F.3d 295, 299 (4th Cir. 2006). "[A] determination on a factual issue made by a State court shall be presumed correct." Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." Green v. Johnson, 515 F.3d 290, 299 (4th Cir. 2008); see Schriro, 550 U.S. at 473-74.[7] Facts found by the appellate courts on direct appeal enjoy the same presumption. See Sumner v. Mata, 449 U.S. 539, 548 (1981). Even when a state court does not decide the same claim presented in federal habeas corpus proceedings, "it may well decide matters relevant to one, quite possibly in the course of deciding highly similar issues of state or federal law." Sharpe, 593 F.3d at 378; see Teleguz v. Pearson, 689 F.3d 322, 332 (4th Cir. 2012) ("[T]he district court may not reject the factual findings of a state court absent clear error.") (citation omitted). So even when a district court considers a claim de novo, it must "apply § 2254(e)(1) to any factual findings made by the state court." "Section 2254(e)(1) plainly seeks to

---

[7] In reviewing the reasonableness of the state court decision, a federal court looks to the last reasoned state court decision. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

conserve judicial resources and reflects Congress's view that there is no reason for a do over in federal court when it comes to facts already resolved by state tribunals." Id. at 379.

Watson raised three claims in state habeas. First that his counsel was ineffective for not having the yellow t-shirt tested, which he alleges trial counsel used to coerce him into pleading guilty.[8] The circuit court found that even if the state habeas petition had been timely, Watson's allegation of ineffective assistance of counsel for not having the shirt tested was without merit. The circuit court also found that Watson's pleas had been knowingly and voluntarily entered, that Watson was not coerced, and that the Commonwealth had disclosed prior to trial that the police had the yellow t-shirt in their possession. The circuit court further found that under Code § 19.2-270.4:1, Watson had the opportunity to have the evidence preserved, but he did not do so, and that absent such an order, the post-trial destruction of evidence collected by police can implicate a defendant's due process rights only if the evidence is destroyed in bad faith. (CCT H at 243-44).[9] The only statements attributable to witnesses for the prosecution are that Watson was dressed all in black at the time of the offense. A reasonable attorney would not have sought the examination of an item of clothing that no witness had connected to the crimes, which is consistent with the conclusion the circuit court reached when it found

> that the other witnesses were consistent that Watson wore a black shirt and pants on August 5 and 6, 2006, before raping the victim, during the crime, and the following day. Accordingly, this Court holds that testing the yellow t-shirt could not have made a material difference to the outcome in Watson's criminal case when

---

[8] The allegation of ineffective assistance of counsel implicitly alleges the fact that counsel knew about the yellow t-shirt at the time of trial. Hence, there was no withholding of exculpatory information, as the circuit court found during the January 25, 2019 hearing on the motion for testing. (CCT2 at 40).

[9] In applying § 2254(d), federal, courts apply the "look through" doctrine to the Supreme Court of Virginia's summary refusal of the appeal and in state habeas, and evaluate the reasonableness of the circuit court's reasoned decision on Watson's state habeas claims. See Brumfield v. Cain, 576 U.S. 305, 313 (2015) (applying "look through" doctrine to evaluate state trial court's reasoned decision denying claim on the merits where state supreme court summarily denied petition for review); Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (federal habeas courts should presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment of rejecting the same claim rest upon the same ground").

> Watson does not admit it was his and no other evidence shows him wearing it at the time of the crimes.

(CCT H at 245-46). To the extent Walton has raised his exhausted allegation of ineffective assistance of counsel in his federal petition, he has not established that the circuit court's dismissal of his allegation of ineffective assistance of counsel was either an unreasonable application of federal law or an unreasonable determination of the facts, and it will be dismissed.

Walton's assertion of a due process violation in state habeas because the yellow t-shirt was destroyed has no merit. In California v. Trombetta, 467 U.S. 479 (1984), the Supreme Court found that a constitutional duty to preserve evidence applied only to evidence that possessed "an exculpatory value that was apparent before the evidence was destroyed," and that was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. Four years later, in Arizona v. Youngblood, 488 U.S. 51 (1988), the Court stressed the importance of the State's good faith in deciding whether to destroy "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. Youngblood held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." Id. at 58 (emphasis added). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56 n.*. Watson does not allege that the destruction of the t-shirt was in bad faith.

To the extent Walton has raised his exhausted allegation of a due process violation for the destruction of the yellow t-shirt over five years after his criminal proceeding had concluded, he has not established that the circuit court's dismissal of his due process claim was either an

unreasonable application of federal law or an unreasonable determination of the facts, and will be dismissed.

The last allegation raised in state habeas was that without testing the yellow t-shirt there was insufficient evidence to support Watson's plea. The evidence proffered during the plea proceedings was sufficient to support Watson's pleas. There is nothing other than speculation to indicate that testing the yellow t-shirt would have produced anything of any exculpatory value. "Where 'there is no indication that there was anything exculpatory' about destroyed evidence, due process has not been violated." United States v. Jobson, 102 F.3d 214, 219 (6th Cir. 1996) (citation omitted); see also Jones v. McCaughtry, 965 F.2d 473, 479 (7th Cir. 1992) (stating there is no violation of due process where destroyed evidence was of only speculative exculpatory value).

### V. Conclusion

For the foregoing reasons, respondent's Motion to Dismiss [Dkt. No. 15] is granted, and this petition must be dismissed with prejudice.[10] An appropriate Order and judgment shall issue.[11]

Entered this ___30th___ day of ___June_____ 2022.

Alexandria, Virginia

_____ /s/
Rossie D. Alston, Jr.
United States District Judge

---

[10] On August 24, 2021, the Court dismissed the petition because Walton did qualify to proceed in forma pauperis and he had not paid the filing fee. [Dkt. No. 8]. Walton subsequently paid the filing fee on September 30, 2021, and the Court vacated the dismissal, reinstated the habeas petition on the active docket, and ordered a response to the petition. [Dkt. No. 10]. Subsequent thereto, Walton filed a Motion to Re-open his civil action [Dkt. No. 13], which will be dismissed as moot.

[11] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.